Stanley Goff, Bar No. 289564
15 Boardman Place Suite 2
San Francisco, CA 94103
Telephone: (415) 571-9570
Email: scraiggoff@aol.com

Fulvio F. Cajina (SBN 289126)
LAW OFFICES OF FULVIO F. CAJINA
528 Grand Avenue
Oakland, CA 94610
Tel:  510-601-0779
Fax: 510-350-3598
Email: fulvio@cajinalaw.com

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

HECTOR A. HERNANDEZ; and MARIA
IBARRA as co-successors-in-interest for
Decedent, HECTOR HERNANDEZ,

                Plaintiffs,

vs.


COUNTY OF ALAMEDA, a municipal
corporation; WELLPATH, a professional
corporation; and DOES 1-50, inclusive,
individually, jointly and severally,

                Defendants.

CASE NO.: 4:20-cv-02884-HSG


**PLAINTIFFS' OPPOSITION TO
DEFENDANT ALAMEDA COUNTY'S
MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM OF POINTS AND
AUTHORITIES**

 **DATE: November 18, 2021**
 **TIME: 2:00 p.m.**
 **JUDGE: Haywood Gilliam**
 **COURTROOM: 2, Fourth Floor**

## I.    __INTRODUCTION__

On April 1, 2019, Decedent Hector Hernandez was booked into Santa Rita Jail in Alameda County. He weighed 150 pounds, was five feet eight inches tall, homeless, alcoholic and schizophrenic. Per Mr. Hernandez's medical records at the jail, he suffered from latent tuberculosis (LTBI) and per Mr. Hernandez's Alameda County medical records, he suffered from hydronephrosis of the right kidney. A review of his Alameda County medical records would have shown that he suffered from Stage 3 chronic kidney disease.

Within days of entering Santa Rita Jail, Mr. Hernandez began to complain about being hungry. He filled out a Medical Request Form and Message Request and requested a special diet. On April 23, 2019, Mr. Hernandez was seen by a dietician. The record is silent as to what transpired in that interaction. Mr. Hernandez also complained of constipation.

After roughly a month at the prison, Mr. Hernandez filled out another Medical Request Form informing the jail's medical staff that he had been "losing noticeable weight." He wrote, "can you please help." According to the medical charts, Mr. Hernandez was seen by nurse Kacey Lebon on May 23, 2021. She informed Mr. Hernandez that his BMI was "within normal limits" but otherwise did not refer Mr. Hernandez to be assessed by a doctor or physician assistant. Unlike a doctor or physician assistant, Ms. Lebon did not have the power to diagnose or prescribe treatment for Mr. Hernandez. By this point, Mr. Hernandez's weight had dropped to 138 pounds.

Within a week of that encounter, Mr. Hernandez again asked to be seen by medical staff. Nurse Lebon again saw Mr. Hernandez. Mr. Hernandez's weight had now dropped to 137 pounds – an 8.7% decrease in less than two months. The medical literature refers to this condition as "unintended weight loss" – the unintended/unexplained loss of 5% of a person's

2

body weight in a short period of time, usually within six and twelve months. Per medical guidelines, when a person is showing signs of unintended weight loss, he or she must be evaluated medically to determine what is going on with their health.

At that last encounter in May 2019, Mr. Hernandez also informed Nurse Lebon that he suffered from kidney disease – "right-sided hydronephrosis." Despite knowing that Mr. Hernandez had lost 8.7% percent of his body weight in a very short period of time (under two months), knowing that Mr. Hernandez suffered from kidney disease, and the fact that Mr. Hernandez's records showed that he suffered from LTBI, Nurse Lebon, again, did not refer Mr. Hernandez to be assessed by a doctor or even a physician assistant. In fact, Nurse Lebon didn't even take Mr. Hernandez's vitals, to see if he was suffering from fever, chest congestion, low oxygen level – nothing. She just noted on the chart that Mr. Hernandez was requesting a high calorie diet.

Throughout Mr. Hernandez's incarceration between April 1 and June 5, 2019, Mr. Hernandez's parents were in touch with him. Plaintiff HECTOR HERNANDEZ and Plaintiff MARIA IBARRA each, separately, spoke with Mr. Hernandez using a Zoom-style program. They each remember that Mr. Hernandez was suffering from a pronounced cough. They also both noted that Mr. Hernandez, who was mentally ill, was behaving very strangely.

On June 5, 2019, Mr. Hernandez was on an "Intensive Observation Log." He was housed in Unit 9 – the psych unit – and was supposed to be observed every 15 minutes because he had expressed suicidal ideation the night before. Despite that, Deputy DAVID HAN, who was assigned to Mr. Hernandez's unit, failed to observe him every 15 minutes. Instead, after an over 60 minute gap, at 4:22 PM, Mr. Hernandez was found dead in his cell.

Santa Rita Jail is run and operated by Defendant COUNTY OF ALAMEDA's ("ALAMEDA") Sheriff's Department. Beginning on August 5, 2016 through the present, the

Sheriff's Department has outsourced all of its inmate medical care services to Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. ("CFMG"). Between August 5, 2016 and August 4, 2019, ALAMEDA paid CFMG over $137 million for their services.

Plaintiffs contend – and the evidence shows – that Mr. Hernandez's death was utterly preventable. For two (2) months, Mr. Hernandez's body was exhibiting clear signs that something was wrong. He was losing a lot of weight at a very rapid pace, yet CMFG, who stands in the shoes of ALAMEDA, never bothered to have Mr. Hernandez evaluated by a doctor or even a physician assistant. The end result of untreated unintended weight loss is death – which is what occurred here. Plaintiffs' medical experts opine that had Mr. Hernandez's unintended weight loss been evaluated and treated, he would not have died since, with the exception of certain cancers (which decedent did not have), all unintended weight loss, whether caused by viruses or not, is treatable. Instead, because of his untreated unintended weight loss, decedent suffered a cardiac event, which ultimately killed him.

Defendants, all of them, contend that Mr. Hernandez died of an acute reason unrelated to Mr. Hernandez's unintended weight loss. However, Defendants' contention is belied by the fact that all of Defendants' experts contradict one another. ALAMEDA's coroner, Dr. John Iocco, for instance, ruled that Mr. Hernandez's death was due to acute interstitial pneumonia. ALAMEDA's expert, Dr. Gerald Berry, testified at his deposition that Mr. Hernandez did not die from acute interstitial pneumonia. Next, Defendants' Dr. Kim Erlich put forth the theory that Mr. Hernandez died from acute aspirational pneumonia – i.e., he drowned to death in his cell after swallowing his own mouth bacteria. Dr. Berry similarly refuted that theory at his deposition. Undaunted, Defendants came up with a third "acute" theory as to why Mr. Hernandez died – now, he died from a flash pulmonary edema, the sort of death that occurs in people suffering from high altitude sickness. Defendants reached that conclusion because, at his autopsy,

decedent's lungs were filled with fluid. Plaintiffs' forensic pathologist, Dr. Bennett Omalu explained, however, that such a finding is normal at autopsy since blood pools naturally with gravity.

Here, decedent's cause of death is clear. He died because CFMG, by and through its staff, failed to provide proper care for Mr. Hernandez even though they get paid millions of dollars to provide it. Moreover, had Santa Rita staff, such as Deputy HAN, been doing their jobs, they would have been able to respond to Mr. Hernandez when he first showed signs of medical distress and gotten him help. Instead, he died alone in his cell after repeatedly asking for help in the weeks leading to his death.

## II.   PRELIMINARY MATTER

As a preliminary matter, Plaintiffs note that in September 2021, after meeting and conferring with opposing counsel, they filed a motion for leave to file a second amended complaint based on evidence uncovered through expert discovery in late August/early September. (*See* Dkt. Nos. 62 and 67). Due to the Court's schedule, Plaintiffs' motion for leave to file a second amended complaint is slated to be heard after Defendants' Motions for Summary Judgment, even those were filed in October 2021. (*See* Dkt. Nos. 65 and 66-1).

## III.   STATEMENT OF FACTS

### A.   The Outsourcing of Care

Defendant ALAMEDA COUNTY outsources the medical services it is supposed to render to inmates of Santa Rita Jail to Defendant CFMG. Between August 8, 2016 and August 7, 2019, ALAMEDA paid CFMG over $135 million for medical services for inmates. (RJN, **Exhibit 1**, p. 1, 12).

### B.   Hector Hernandez Medical Records

Hector Hernandez received care from ALAMEDA in the five years prior to his death. Mr.

Hernandez was diagnosed with suffering from hydronephrosis of the right kidney by the Alameda County Health System – Highland Hospital. Additionally, laboratory tests indicate that Mr. Hernandez had high creatinine levels. (*See* Cajina Dec., **Exhibit 1**). Per Dr. Mario Curzi, Defendants' expert, Mr. Hernandez suffered from chronic kidney disease. (*See* Cajina Dec., **Exhibit 2, 38:10-20**). Similarly, given Mr. Hernandez's laboratory results from Highland Hospital, he suffered from kidney problems, specifically, stage 3 chronic kidney disease given that creatinine is a marker for kidney disease. (*See* Cajina Dec., **Exhibit 2, 39:23-40:4, 43:21-44:11, 50:15-20; 62:2-14, 67:22-68:17**). Per Dr. Mario Curzi – defendants' expert – Mr. Hernandez was at higher risk for sudden cardiac death. (*See* Cajina Dec., **Exhibit 2, 50:15-20**).

C. <u>**Lack of Medical Treatment Received by Mr. Hernandez at Santa Rita Jail**</u>

Mr. Hernandez entered Santa Rita Jail for the last time on April 1, 2019. (*See* Cajina Dec., **Exhibit 3, MEDFILE0251**). He weighed 150 pounds upon entry. He was also homeless, alcoholic, schizophrenic and young – 39 years old. (*See* Cajina Dec., **Exhibit 3, MEDFILE0254-255, 283, 291**). Per Mr. Hernandez's medical records at the jail, he suffered from latent tuberculosis (LTBI), (*see* Cajina Dec., **Exhibit 3, MEDFILE0271**), and per Mr. Hernandez's Alameda County medical records, he suffered from hydronephrosis of the right kidney. A review of his Alameda County medical records would have shown that he suffered from Stage 3 chronic kidney disease. (*See* Cajina Dec., **Exhibit 1,** and also **Exhibit 2, 39:23-40:4, 43:21-44:11, 50:15-20; 62:2-14, 67:22-68:17**).

Within days of entering Santa Rita Jail, Mr. Hernandez began to complain about being hungry. He filled out a Medical Request Form and Message Request, requesting a special diet. (*See* Cajina Dec., **Exhibit 3, MEDFILE0256, 260**). On April 23, 2019, Mr. Hernandez was seen by a dietician. (*See* Cajina Dec., **Exhibit 3, MEDFILE0278**). The record is silent as to what transpired in that interaction. Mr. Hernandez also complained of constipation. (*See* Cajina Dec.,

**Exhibit 3, MEDFILE0279**).

After roughly a month at the prison, Mr. Hernandez filled out another Medical Request Form informing the jail's medical staff that he had been "losing noticeable weight." He asked, "can you please help." (*See* Cajina Dec., **Exhibit 3, MEDFILE0272**). According to the medical charts, Mr. Hernandez was seen by nurse Kacey Lebon on May 23, 2021. She informed Mr. Hernandez that his BMI was "within normal limits" but otherwise did not refer Mr. Hernandez to be assessed by a doctor or physician assistant. (*See* Cajina Dec., **Exhibit 3, MEDFILE0278**). Unlike a doctor or physician assistant, a nurse such as Ms. Lebon does not have the power to diagnose or prescribe treatment for patients/inmates. (*See* Swaby Dec., **Exhibit 1, p. 5-6**). By this point, Mr. Hernandez's weight had dropped considerably to 138 pounds. (*See* Cajina Dec., **Exhibit 3, MEDFILE0283-284**).

Within a week of that encounter, Mr. Hernandez again asked to be seen by medical staff. Nurse Lebon again saw Mr. Hernandez. Mr. Hernandez's weight had now dropped to 137 pounds – an 8.7% decrease in less than two months – and the lowest weight that can be found in Mr. Hernandez's entire medical file. (*See* Cajina Dec., **Exhibit 3, MEDFILE0278-9; 283-84**).

The medical literature refers to a rapid, unexpected weight loss as "unintended weight loss." Unintended weight loss is defined as a 5% drop in a person's body weight within a short period of time, usually within six or twelve months. Per medical guidelines, when a person is showing signs of unintended weight loss, he or she must be evaluated medically to determine what is causing that symptom. (*See* Swaby Dec., **Exhibit A, p. 7**).

During Mr. Hernandez's last encounter with Santa Rita medical staff in late May 2019, Mr. Hernandez also informed Nurse Lebon that he suffered from kidney disease – "right-sided hydronephrosis." (*See* Cajina Dec., **Exhibit 3, MEDFILE0278-9**). Despite knowing by then that Mr. Hernandez had lost 8.7% percent of his body weight in a very short period (under two

months), knowing that Mr. Hernandez suffered from kidney disease, and the fact that Mr. Hernandez's records showed that he suffered from LTBI, Nurse Lebon, again, did not refer Mr. Hernandez to be assessed by a doctor or even a physician assistant even though it was in her discretion to do so. In fact, Nurse Lebon didn't even take Mr. Hernandez's vitals, to see if he was suffering from fever, chest congestion, low oxygen level, heart irregularities – anything. She just noted on the chart that Mr. Hernandez was requesting a high caloric diet. There was no follow-up or assessment. (*See* Cajina Dec., **Exhibit 3, MEDFILE0278-9**; **Exhibit 4**, **36:2-17**, **60:11-61:20**, **63:3-11**).

In fact, CFMG admits that throughout his last stay at Santa Rita, Mr. Hernandez was never evaluated, seen, or met with a doctor. (*See* Cajina Dec., **Exhibit 7**).

Throughout Mr. Hernandez's incarceration between April 1 and June 5, 2019, Mr. Hernandez's parents were in touch with him. Plaintiff HECTOR HERNANDEZ and Plaintiff MARIA IBARRA each, separately, spoke with Mr. Hernandez using a Zoom-style program. They each remember that Mr. Hernandez was suffering from a pronounced cough. (*See* Cajina Dec., **Exhibits 5 and 6**).

D. <u>Lack of Observation on the date of his death</u>

On June 5, 2019, Mr. Hernandez was placed on an "Intensive Observation Log." He was housed in Unit 9 – the psych unit – and was supposed to be observed every 15 minutes because he had expressed suicidal ideation the night before. Mr. Hernandez was supposed to be observed frequently for his safety. Despite that, Deputy DAVID HAN, who was assigned to Mr. Hernandez's unit, failed to observe him every 15 minutes as required by policy. Instead, after an over 60-minute gap, at 4:22 PM, Deputy HAN discovered Mr. Hernandez dead in his cell. (*See* Stanley Dec., **Exhibit A, p. 4-6**; Cajina Dec., **Exhibits 8, 9, and 10**).

8

**E. Lack of Medical Care for Decedent's Unintended Weight Loss Led to His Death**

Mr. Hernandez's death was utterly preventable had anyone at ALAMEDA and CFMG done anything to address his rapid weight loss. For two (2) months, Mr. Hernandez's body was exhibiting clear signs that something was wrong. He was losing a lot of weight at an alarming rate, yet CMFG, who stands in the shoes of ALAMEDA, never bothered to have Mr. Hernandez evaluated by a doctor or even a physician assistant. The end result of untreated unintended weight loss is death – which is what occurred here. (*See* Omalu Dec., **Exhibits A and B**; Swaby Dec., **Exhibits A and B**).

Plaintiffs' medical experts opine that had Mr. Hernandez's unintended weight loss been evaluated and treated, he would not have died since, with the exception of certain cancers (which decedent did not have), all unintended weight loss, whether caused by viruses or not, is treatable. Instead, because his unintended weight loss went untreated, decedent suffered a cardiac event, which ultimately killed him given that no one was around to render him help for over an hour even though ALAMEDA sheriff's deputies were supposed to observe Mr. Hernandez every 15 minutes for his safety. (*See* Omalu Dec., **Exhibits A and B**; Swaby Dec., **Exhibits A and B**; Stanley Dec., Exhibit A).

Defendants, all of them, contend that Mr. Hernandez died of an acute reason unrelated to Mr. Hernandez's unintended weight loss. However, Defendants' contention is belied by the fact that all of Defendants' experts contradict one another. ALAMEDA's coroner, Dr. John Iocco, for instance, ruled that Mr. Hernandez's death was due to acute interstitial pneumonia. (*See* Cajina Dec., **Exhibits 11**). But Defendants' joint expert, Dr. Gerald Berry, testified at his deposition that Mr. Hernandez did not die from acute interstitial pneumonia. (*See* Cajina Dec., **Exhibits 12**). Next, Defendants' Dr. Kim Erlich put forth the theory that Mr. Hernandez died from acute aspirational pneumonia – i.e., he drowned to death in his cell after swallowing his own mouth

bacteria. (*See* Cajina Dec., **Exhibits 13**).  Dr. Berry similarly refuted that theory at his

deposition. (*See* Cajina Dec., **Exhibits 12**). Undaunted, Defendants came up with a third "acute"

theory as to why Mr. Hernandez died – now, he died from a flash pulmonary edema, the sort of

death that occurs in people suffering from high altitude sickness. Defendants reached that

conclusion because, at his autopsy, decedent's lungs were filled with fluid. (*See* Cajina Dec.,

**Exhibits 14**). However, Plaintiffs' forensic pathologist, Dr. Bennett Omalu explained that such a

finding is normal at autopsy since blood pools naturally with gravity. (*See* Omalu Dec., **Exhibit

B**).

Here, decedent's cause of death is clear. He died because ALAMEDA and CFMG, by

and through its staff, failed to provide proper medical care for Mr. Hernandez. Moreover, had

Santa Rita staff, such as Deputy HAN, been doing their jobs, they would have been able to

respond to Mr. Hernandez when he first showed signs of medical distress and gotten him help.

Instead, he died alone in his cell after repeatedly asking for help in the weeks leading to his

death. This is a case of death ultimately due to deliberate indifference.

## IV.   ANALYSIS

### Legal Standard

Summary judgment is properly granted when no genuine and disputed issues of material

fact remain, and when viewing the evidence most favorably to the non-moving party, the movant

is clearly entitled to prevail as a matter of law. FRCP 56; *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986). A "genuine" issue of material fact exists if there is sufficient evidence for a

reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). A fact is "material" if it is relevant to an element of a claim or a

defense, the existence of which may affect the outcome of the suit. *T.W. Elec. Serv., Inc. v.*

*Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Disputes as to material issues of fact do preclude summary judgment. *Lynn v. Sheet Metal Workers Int'l Ass'n*, 804 F.2d 1472, 1478 (9th Cir. 1986).

**DEFENDANTS ARE LIABLE FOR DELIBERATE INDIFFERENCE**

Because Decedent was a pretrial detainee, Plaintiffs' claim arises under the Fourteenth Amendment's Due Process clause. *See Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018); *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1067-70 (9th Cir. 2016) (*en banc*). Plaintiffs' claim is therefore to be evaluated under "an objective deliberate indifference standard." *Gordon*, 888 F.3d at 1124-25. As such, Plaintiffs are required to make out the following elements: (i) the defendant made an intentional decision with respect to the conditions under which the Decedent was confined; (ii) those conditions put the Decedent at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved - making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant **caused** the Decedent's injuries. *Id.* at 1125. With respect to the third element in particular, "the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Id.* (omitting internal punctuation and quotation marks). "'[M]ere lack of due care'" is not enough; "the plaintiff must 'prove more than negligence but less than subjective intent - something akin to reckless disregard.'" *Id.* (quoting *Castro*, 833 F.3d at 1071).

This Court should conclude that Plaintiffs can make out a triable issue of fact with respect to each of the elements of this claim as to Deputy Han. Deputy Han knowingly f**ailed to perform** safety checks required by policy and law, and he was charged with **performing** them (under the view of the facts resolved in Plaintiffs' favor); there are facts supporting a conclusion that safety-checks are designed with the purpose of ensuring that **inmates** are alive-and-well and to determine whether they need any medical treatment, and that **failure to perform** - or a delay in **performing** - them increases the **inmates**' risk of harm and could threaten their health or at the very least delay medical assistance and emergency response; and there are disputes concerning whether, had Deputy Han **performed** the safety checks as required, he would have discovered Decedent and **Decedent's** condition in time to aid or save him.

Furthermore, there are certainly facts supporting the view that Decedent was suffering a serious medical need - one any layperson could have **observed** (had that layperson been in position to **observe** it or to come into contact with **Decedent's** cellmate) - and a reasonable factfinder could conclude that Deputy Han's failures played a causal role in **Decedent's death** (including whether quicker delivery of care would have made a difference) and constituted reckless disregard in light of the failure to conduct safety checks as required. *See generally Lemire v. California Department of Corrections and Rehabilitation*, 726 F.3d 1062, 1076-77, 1080-81 (9th Cir. 2013); *see also Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th Cir. 2009) ("'*[F]oreseeable* intervening **causes** . . . will not supersede the defendant's responsibility.").

12

**THE DEFENDANTS ARE LIABLE FOR DENIAL OF FAMILY ASSOCIATION**

The substantive due process right to family integrity or to familial association is well established."); *United States v. Wolf Child*, 699 F.3d 1082, 1091 (9th Cir. 2012) ("A parent has a fundamental liberty interest in companionship with his or her child." (citation and quotation omitted)); *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct and where circumstances are such that actual deliberation is practical, an officer's deliberate indifference meets the "shock the conscience" standard of the Fourteenth Amendment; *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986) (permitting parents to assert a familial association claim where their decedent, a pre-trial detainee, committed suicide while in prison).

Deputy Han knowingly f**ailed to perform** safety checks required by policy and law, and he was charged with **performing** them (under the view of the facts resolved in Plaintiffs' favor); there are facts supporting a conclusion that safety-checks are designed with the purpose of ensuring that **inmates** are alive-and-well and to determine whether they need any medical treatment, and that **failure to perform** - or a delay in **performing** - them increases the **inmates'** risk of harm and could threaten their health or at the very least delay medical assistance and emergency response; and there are disputes concerning whether, had Deputy Han **performed** the safety checks as required, he would have discovered Decedent and **Decedent's** condition in time to aid or save him.

Furthermore, there are certainly facts supporting the view that Decedent was suffering a serious medical need - one any layperson could have **observed** (had that layperson been in position to **observe** it or to come into contact with **Decedent's** cellmate) - and a reasonable factfinder could conclude that Deputy Han's failures played a causal role in **Decedent's death** (including whether quicker delivery of care would have made a difference) and constituted reckless disregard in light of the failure to conduct safety checks as required. *See generally Lemire v. California Department of Corrections and Rehabilitation*, 726 F.3d 1062, 1076-77, 1080-81 (9th Cir. 2013); *see also Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th Cir. 2009) ("'*[F]oreseeable* intervening **causes** . . . will not supersede the defendant's responsibility."). Thus, viewing the facts in a light most favorable to the Plaintiff, the Defendants are liable with respect to this claim.

**DEFENDANT ALAMEDA COUNTY IS LIABLE UNDER MONELL**

Under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), local governing bodies can be held liable "where 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers,' or where the action is made 'pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Jackson v. Barnes*, 749 F.3d 755, 762-63 (9th Cir. 2014  (quoting *Monell*, 436 U.S. at 690-91)). "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy[, custom or practice]; (3) that this policy[, custom or practice] amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy[, custom or practice] is the moving force behind the

constitutional violation.'" *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)); *see also Galen v. Cty. of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007) (making clear that *Monell* liability concerns not just policies, but also customs and practices). The "moving force" question looks for a "direct causal link" between the policy/custom/practice and the Constitutional deprivation, requiring a demonstration of both **causation**-in-fact and proximate **causation**. *See Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 797 (9th Cir. 2016) (*en banc*); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013); *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 958 (9th Cir. 2008). "[P]olicies of inaction as well as policies of action" can give rise to *Monell* liability. *Id.* at 763. "[A] policy of inaction is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.'" *Id.* (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012)). "In inaction cases, the plaintiff must show, first, 'that [the] policy amounts to deliberate indifference to the plaintiff's constitutional right.'" *Id.* (quoting *Tsao*, 698 F.3d at 1143). "This requires showing that the defendant 'was on actual or constructive notice that its omission would likely result in a constitutional violation.'" *Id.* (quoting *Tsao*, 698 F.3d at 1145). "Second, the plaintiff must show 'that the policy **caused** the violation in the sense that the municipality could have prevented the violation with an appropriate policy.'" *Id.* (quoting *Tsao*, 698 F.3d at 1143). Normally the question of whether a policy or custom exists is a jury question. *See Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996).

Here, Plaintiffs identify the customs/policies here as: 1) Alameda County maintained a policy or de facto unconstitutional informal custom or practice of permitting, condoning, or improperly training jail personnel to delay in providing adequate medical assistance to detainees that had viral medical conditions. 2) COUNTY maintained a policy, custom or practice of failing to provide the jail with adequate personnel to supervise detainees. 3) COUNTY failed to train staff to properly classify, ***monitor (conduct safety checks***) and treat inmates that had viral medical conditions in violation of Title 15 Minimum Standards for Local Detention Facilities. These customs and practices are the "moving force" behind the Constitutional violations here because the County's "acquiescence to these shortcomings are persisting.

It is no doubt true that the County has in place policies that are meant to prevent what happened to Decedent. But it is also true that, in terms of *practices*, those policies were violated. How do we know this? There are facts supporting a conclusion that **Decedent's death** was just one of many **deaths that have taken place in the Santa Rita Jail within the last five years.**  In fact, on May 7, 2019, the East Bay Express released an article entitled "The Most Dangerous Place in Alameda County". The report outlines deficiencies pertaining to the COUNTY jail. Deficiencies include but are not limited to: deputies failing to classify, failing to monitor and treat serious and obvious medical conditions that have led to the deaths of numerous pre-trial inmates, and that these deficiencies caused the rate of deaths at the COUNTY'S jail to be the highest rates of inmate deaths in the San Francisco Bay Area.

In addition, Plaintiffs have presented evidence indicating that the County has a pattern and practice of allowing safety check logs to be regularly falsified. Those facts would support custom, policy and/or practice findings of not just "inaction" in the face of policies mandating otherwise, but of a failure to train. *See* Dougherty, 654 F.3d at 900 ("Failure to train may amount to a policy of 'deliberate indifference,' if the need to train was obvious and the failure to do so made a violation of constitutional rights likely."). And as with the negligence claim discussed *supra*, (while the Court may find that Plaintiffs' argument on this point is not, perhaps, the most-convincing) the Court should conclude that the question of **causation**/"moving force"-analysis is simply not clear enough on these facts for the Court to rule at summary judgment.

**DEFENDANTS ARE LIABLE FOR DECEDENT'S WRONGFUL DEATH**

Under California law, a negligence claim requires proof of: 1) the existence of a legal duty to use due care, 2) a breach of that duty, and 3) the breach as a proximate **cause** of the plaintiff's injury. *See Kim v. Cty. of Monterey*, 43 Cal.App.5th 312, 324 (2019). "To be considered a proximate **cause** of an injury, the acts of the defendant must have been a 'substantial factor' in contributing to the injury." *Grotheer v. Escape Adventures, Inc.*, 14 Cal.App.5th 1283, 1303 (2017). "Generally, a defendant's conduct is a substantial factor if the injury would not have occurred but for the defendant's conduct." *Id.* "If the injury 'would have happened anyway, whether the defendant was negligent or not, then his or her negligence was not a **cause** in fact, and of course cannot be the legal or responsible **cause**.'" *Id.* (omitting internal quotation marks) (quoting *Toste v. CalPortland Constr.*, 245 Cal.App.4th 362, 370 (2016)). A force which "plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor, but a very minor force that does **cause** harm is a substantial factor." *Bockrath*

*v. Aldrich Chem. Co.*, 21 Cal.4th 71, 79 (1999) (omitting internal quotation marks)

(quoting *Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 969 (1997)).

Proximate **cause** is ordinarily a question of fact but may be decided as a question of law

if under the undisputed facts, there is no room for a reasonable difference of opinion.

*See Grotheer*, 14 Cal.App.5th at 1303; *see also Vickers v. United States*, 228 F.3d 944, 953-54

(9th Cir. 2000) (noting that, under California law, "if the question whether 'the actor's conduct

[was] a substantial factor in bringing about the plaintiff's harm' is 'open to reasonable difference

of opinion,' summary judgment [is] improper") (quoting *Constance B. v. State of Cal.*, 178

Cal.App.3d 200, 210 (1986)). Thus, California law on the question is in-line with the general

approach to this question. *See, e.g., Christensen v. Georgia-Pacific Corp.*, 279 F.3d 807, 815

(9th Cir. 2002) ("As with the issue of breach, proximate **cause** is usually a factual decision that

should be decided at trial."). Still, other California decisions have drawn the requirement for

prevailing on this element at summary judgment even more strictly: "'[T]he question of

proximate **cause** . . . becomes one of law *where the facts are uncontroverted and* only one

deduction or inference may reasonably be drawn therefrom.'" *Moua v. Pittullo, Howington,*

*Barker, Abernathy, LLP*, 228 Cal.App.4th 107, 113 (2014) (emphasis added) (quoting *Whinery v.*

*S. Pac. Co.*, 6 Cal.App.3d 126, 128 (1970)).

Here, Deputy Han had a duty of care (including the duty to obtain medical care) arising

from the special relationship between a jailer and a prisoner and from the safety-check related

statutory/regulatory obligation posed by 15 C.C.R. § 1027.5. With respect to **causation**, the

substantial factor test requires only that the contribution of the individual **cause** be more than

negligible or theoretical, and further rely on the recognition that the issue is normally a question

of fact for a jury. None of the Defendants' arguments are sufficient for the Court to conclude

otherwise than that triable issues of fact preclude deciding this claim on summary judgment. Viewing *the facts in Plaintiffs' favor*, Deputy Han **failed to perform** safety checks on Decedent as was required and, had he done so, he would have come into contact with Decedent and, taking the facts in the light most favorable to Plaintiffs, once Deputy Han eventually arrived at Decedent's cell, **Decedent's** condition could have been treated earlier, potentially preventing his **death**.

Plaintiffs also cite California Government Code § 845.6 as the foundation for their wrongful death claim. § 845.6 can serve as a basis for their wrongful death claim. *See Villarreal*, 254 F. Supp. 3d at 1190-91. Likewise, deliberate indifference under 42 U.S.C. § 1983 can form the basis for a wrongful death claim. *Id.*; *Estate of Prasad ex rel. Prasad v. Cty. of Sutter*, 958 F. Supp. 2d 1101, 1118 (E.D. Cal. 2013).

## DEFENEDANT ALAMEDA COUNTY IS LIABLE PURSUANT TO CALIFORNIA GOVERNMENT CODE SECTION § 845.6

California Government Code Section 845.6 provides, in pertinent part, that: [n]either a public entity nor a public employee is liable for injury proximately **caused** by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but . . . a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he **fails** to take reasonable action to summon such medical care. Cal. Gov't Code § 845.6. In order to state a claim under this section, a prisoner must establish three elements: 1) the public employee knew or had reason to know of the need 2) for immediate medical care, and 3) **failed** to reasonably summon such care. *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 606 (9th Cir. 2019). "California cases have repeatedly limited

liability under the statute temporally 'to serious and obvious medical conditions requiring immediate care.'" *Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal.App.4th 1051, 1074 (2013); *see also Watson v. State of Cal.*, 21 Cal.App.4th 836, 841 (1993); *Jett v. Penner*, 439 F.3d 1091, 1099 (9th Cir. 2006). *But see Horton by Horton*, 915 F.3d at 608 ("*Jett* makes clear that 'immediate' does not signify urgent; rather, the obligation to summon immediate medical care requires that the public employee act in a '**timely**' manner, so as to prevent further injury.") (quoting *Jett*, 439 F.3d at 1093).

   With respect to this claim, Defendants principally argue that the statutory duty exists only when there is actual or constructive knowledge of a need for immediate medical care and extends only to serious and obvious medical conditions requiring immediate care, as set forth above. Defendants argue that there is no evidence that Deputy Han knew or had reason to know Decedent had the requisite need.

   Plaintiffs' response in connection with this claim is combined with their response on their negligence and wrongful **death** claims. Deputy Han had an established duty of care (including the duty to obtain medical care) arising from the special relationship between a jailer and a prisoner and from the safety-check related statutory/regulatory obligation posed by 15 C.C.R. § 1027.5. With respect to **causation**, the substantial factor test requires only that the contribution of the individual **cause** be more than negligible or theoretical. Thus, this issue is normally a question of fact for a jury. Deputy Han was directly in charge of **performing** safety checks on the Decedent on the date of the incident and **failed** to do so. *See Zeilman v. Cty. of Kern*, 168 Cal.App.3d 1174, 1186 (1985) (describing the requirement as whether the defendants "knew *or should have known* of a need for immediate medical care") (emphasis added). The County employed Deputy Han and he was clearly acting within the scope of his employment (as required

20

for public entity liability under Section 845.6). *Castaneda*, 212 Cal.App.4th at 1070; *see also* Cal. Gov't Code § 815.2(a).

Though Deputy Han summoned medical care once he obtained *actual* knowledge of **Decedent laying om the floor unresponsive,** his failure to do so at a time - if the conflict in the evidence about the timing of **Decedent's** condition is resolved in favor of Plaintiffs, as is required on this motion - when Han had *reason to know* of that condition because of his obligation to **perform timely** safety-checks, demonstrates the existence of a triable issue of fact with respect to each of the three elements required for a Section 845.6 claim. *See Johnson v. Cty. of L.A.*, 143 Cal.App.3d 298, 317 (1983) (concluding that actual or constructive knowledge of need for immediate care and reasonable action to summon were questions of fact to be determined at trial); *cf. Horton by Horton*, 915 F.3d at 607 ("Had Officer Brice requested a prompt psychiatric evaluation or otherwise summoned psychiatric care, Horton could have been found sooner and the period of anoxia he suffered shortened.").

## V.   CONCLUSION

Therefore, the Defendants' Motion for Summary Judgment should be denied in its entirety.

October 28, 2021

/s/ *Stanley Goff*

STANLEY GOFF
Attorney for PLAINTIFF

21