UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR A HERNANDEZ, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF ALAMEDA, et al.,<br><br>Defendants. | Case No. 20-cv-02884-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**<br><br>Re: Dkt. Nos. 62, 65, 66 |

Pending before the Court is Defendants' motions for summary judgment and Plaintiffs' motion for leave to file a second amended complaint. *See* Dkt. Nos. 62, 65, 66. The Court held a hearing on the motions. For the reasons detailed below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions for summary judgment and **DENIES** Plaintiffs' motion to amend the complaint.

**I.   BACKGROUND**

   **A.   Factual Background**

The underlying facts in this case are tragic, but largely undisputed. On June 5, 2019, Mr. Hector Hernandez died at Santa Rita Jail in Alameda County where he was held as a pretrial detainee. His parents and co-successors-in-interest, Plaintiffs Hector A. Hernandez and Maria Ibarra, allege that Mr. Hernandez died due to the denial of proper medical care while he was in custody. *See, e.g.*, Dkt. No. 43 ("FAC") at ¶¶ 1, 19. Because the parties dispute the nature of Mr. Hernandez's treatment and the cause of his death, the Court provides a brief overview of his care while in custody.

Mr. Hernandez was arrested and initially booked into custody on April 1, 2019. *See* Dkt.

No. 65-1, Ex. A at 14.[1]  At that time, Defendant California Forensic Medical Group, Inc. ("CFMG") evaluated him.  *See* Dkt. No. 65-1, Ex. B at 19, 23–29.  According to their records, Mr. Hernandez was 5'8 and weighed 150 pounds.  *See id.* at 23.  During his intake screening, Mr. Hernandez told medical staff that he had a history of schizophrenia; he drank alcohol every day and occasionally experienced withdrawals when he did not drink; and he had been hospitalized the week before for mental health reasons.  *See id.* at 24–26.  He also reported a history of Latent Tuberculosis Infection ("LTBI").  *See id.* at 24, 27; *see also* Dkt. No. 73, Ex. 3 at 46.  Mr. Hernandez was transferred to Santa Rita Jail on April 3.  *See* Dkt. No. 65-1, Ex. A at 16.

On April 8, Mr. Hernandez met with CFMG nurse Dashmeet Kaur, complaining of pain and sensitivity from a toothache.  *See* Dkt. No. 73, Ex. 3 at 33, 55.  Mr. Kaur noted that a tooth was broken and decayed, and scheduled Mr. Hernandez for a dental sick call.  *Id.*  That same day, Mr. Hernandez submitted a Medical Request Form, stating "I need to change my diet as soon as possible.  I am a vegetarian."  *See id.* at 31.  On April 10, Mr. Hernandez again requested a vegetarian diet.  *See id.* at 55.  CFMG staff told him that he had to make special dietary requests through inmate services.  *Id.*  Mr. Hernandez submitted the request to inmate services the same day.  *See id.* at 35.  On the form, he said:  "I need to change my diet to a non-sugar, no salt and vegetarian diet as soon as possible.  I'm not eating right and am hungry.  I am homeless."  *See id.*

On April 14, Mr. Hernandez was placed on an "Intensive Observation Log" ("IOL") because he had expressed suicidal ideations.  *See* Dkt. No. 65-1, Ex. B at 6, 16–17.  He remained on this IOL until May.  *See* Dkt. No. 65-1, Ex. A at 15–16.  On April 16, CFMG physician assistant Jeffrey Cooper evaluated Mr. Hernandez based on his previously diagnosed LTBI.  *See* Dkt. No. 73, Ex. 3 at 36–37, 54–55.  Mr. Hernandez indicated that he took medication for six months in 2004 to treat his LTBI.  *Id.*  Mr. Cooper determined that no further treatment was necessary for the LTBI at that time.  *Id.*; *see also* Dkt. No. 65-1, Ex. C at (Cooper Depo. at 68:10–69:21, 83:8–85:20).

On April 19, Mr. Hernandez complained of constipation, and saw CFMG nurse Kacey

---

[1] For ease of reference, the Court refers to the PDF pagination unless otherwise noted.

Lebon. *See* Dkt. No. 73, Ex. 3 at 54. At the time, Mr. Hernandez declined an additional abdominal and vital signs assessment, asking to return to his cell. *Id.* at 38–39, 54. Ms. Lebon gave him milk of magnesia. *Id.* On April 22, Mr. Hernandez was treated for his dental problems. *See id.* at 41.

The next day, Mr. Hernandez saw a dietician. *See id.* at 53, 70; *see* Dkt. No. 65-1, Ex. B at 18–19. According to his chart, Mr. Hernandez requested a no sugar, no salt, vegetarian diet "due to personal and spiritual reasons he did not want to disclose." *See* Dkt. No. 65-1, Ex. B at 18–19. He also requested an extra snack a day. *Id.* The dietician noted that Mr. Hernandez's weight remained within normal limits, and did not believe a high-calorie diet was necessary. *See id.* A few weeks later, on May 15, 2019, Mr. Hernandez noted that he had "been losing noticeable weight" and requested extra food. *See* Dkt. No. 73, Ex. 3 at 47. He again noted that he was vegetarian. *Id.* He saw Ms. Lebon on May 23 regarding his request for a high-calorie diet. *See id.* at 53–54; *see also* Dkt. No. 65-1, Ex. B at 18. Ms. Lebon noted his weight loss, but stated that his BMI was still within normal limits. *Id.* She also reiterated that the dietician had not found any nutrition-related diagnosis requiring a high-calorie diet. *Id.*

Two days later, on May 25, Mr. Hernandez placed a sick call request, again requesting a high-calorie diet due to weight loss. *See* Dkt. No. 73, Ex. 3 at 53. He also reported having hydronephrosis of his right kidney and the inability to eat sugar. *See id.* at 53, 70. Mr. Hernandez saw Ms. Lebon again on May 29, at which point she noted that his weight was still within normal limits. *See id.* At the time, Mr. Hernandez weighed 137 pounds. *Compare* Dkt. No. 65-1, Ex. B at 23, *with* Dkt. No. 73, Ex. 3 at 53–54. Ms. Lebon requested information regarding his hydronephrosis diagnosis from Highland Hospital, where Mr. Hernandez said he had been diagnosed. *See* Dkt. No. 73, Ex. 3 at 48–49, 53–54. On May 31, Highland responded that it had no records for Mr. Hernandez. *See id.* at 70–71.

On June 4, Mr. Hernandez was again placed on an IOL for expressing suicidal ideations. *See* Dkt. No. 65-1, Ex. A at 16. At approximately 11:49 a.m. on June 5, Mr. Hernandez was evaluated by an Adult Forensic Behavioral Health Clinician T. Bui. *See id.* at 11. When asked if he was feeling okay, Mr. Hernandez stated "no, I don't know, I'm trying to play this [card] game."

*Id.* When asked if he was feeling suicidal, he stated "I don't want to talk right now." *Id.* Mr. Bui therefore decided to continue the IOL. *Id.* At 3:05 p.m. that day, Alameda County Deputy David Han and Deputy J. Ramos checked on Mr. Hernandez. *Id.* at 7–8. According to them, Mr. Hernandez was on his bed covered with a security blanket. *Id.* They stated that he was still breathing and did not display any signs of distress. *Id.*

The parties agree that the IOL required deputies to observe Mr. Hernandez every 15 minutes. *See, e.g.*, Dkt. No. 65 at 2; *cf.* Dkt. No. 65-1, Ex. A at 6. But no one checked on Mr. Hernandez again until approximately 4:20 p.m. *See* Dkt. No. 65-1, Ex. A at 6, 13. At that time, Deputy Han saw Mr. Hernandez lying on the floor on his back, and he was not responsive. *Id.* at 6–7. When Deputy Han entered the cell, Mr. Hernandez did not appear to be breathing so he called for emergency medical assistance and began performing chest compressions. *See id.*; *see also* Dkt. No. 65-1, Ex. F (body cam video). Other staff arrived and continued chest compressions and used an Automated Electric Defibrillator until Alameda County Fire personnel arrived and took over the medical treatment. *Id.* Mr. Hernandez was declared dead at 5:02 p.m. *See id.* at 5.

Dr. John Iocco, who performed the autopsy for the Coroner's Bureau, listed Mr. Hernandez's cause of death as "acute respiratory failure due to acute interstitial pneumonia/hemorrhage." Dkt. No. 65-1, Ex. G at 67. Interstitial pneumonia is a condition in which a patient's lungs fill up with fluid and blood, which prevents proper oxygen exchange and leads to heart failure. *See* Dkt. No. 65-1, Ex. H at 79–86 (Iocco Depo. at 31:22–38:1). Accordingly, Dr. Iocco testified that Mr. Hernandez died very suddenly and likely within a matter of minutes. *See id.* at 84–86 (Iocco Depo. at 36:6–38:1). Dr. Iocco also listed "aspiration of oral/pharyngeal bacteria" as an additional condition. Dkt. No. 65-1, Ex. G at 67. The coroner concluded "[b]ased on [its] investigation, toxicology results, lack of trauma, and the autopsy protocol" that "the manner of Hernandez-lbarra's death [was] natural." *Id.* at 65.

**B.  Procedural History**

Plaintiffs initially filed this action in April 2020. *See* Dkt. No. 1. They amended their complaint in March 2021. *See* FAC. In the FAC, Plaintiffs sued Defendants County of Alameda; Wellpath, Inc.; CFMG; and several employees of CFMG, including Kacey Lebon, Corey Levin,

4

and Jeffrey Cooper. *See* FAC at ¶¶ 10–15. Plaintiffs also listed several unidentified "Doe" Defendants. *See id.* at ¶ 16. At the time, Plaintiffs alleged that Mr. Hernandez died from an untreated viral infection. *See, e.g.*, *id.* at ¶¶ 19, 24–27, 32, 64, 72, 77, 85–87.

Plaintiffs asserted (1) several causes of action under 42 U.S.C. § 1983 for deliberate indifference, wrongful death, and violating Mr. Hernandez's civil rights, in violation of the Fourteenth Amendment; (2) a *Monell* claim against Alameda County, alleging that it has policies or practices of failing to provide and permitting the delay of medical assistance; (3) a negligence claim under California law; (4) a violation of California Government Code § 845.6; (5) California Code of Civil Procedure §§ 377.60 and 377.61; (6) intentional infliction of emotional distress; and (7) medical malpractice. *See id.* at ¶¶ 20–102.

As discussed in Section III below, Plaintiffs seek to amend their complaint yet again. *See* Dkt. No. 62. They filed a motion for leave to file the second amended complaint approximately two weeks before the deadline to file dispositive motions. *See* Dkt. Nos. 58, 62. The proposed second amended complaint dismisses Defendants Wellpath, Inc., Corey Levin, and Jeffery Cooper. It adds Deputy Han as a Defendant instead. *See* Dkt. No. 62-1 ("SAC") at ¶ 11. Rather than a viral infection, Plaintiffs assert that Mr. Hernandez actually died from untreated chronic kidney disease and unintended weight loss, which is a symptom of myriad underlying conditions. *See id.* at ¶¶ 18–19, 23, 34, 40. They allege that Defendants were aware Mr. Hernandez was ill, but failed to provide proper care. Plaintiffs state that Mr. Hernandez exhibited serious health warnings in the weeks prior to his death, including unintended weight loss of 8.7% of his body weight. *See id.* at ¶¶ 16–19. The proposed SAC also streamlines Plaintiffs' causes of action and removes the claim for intentional infliction of emotional distress and wrongful death under 42 U.S.C § 1983. *See id.* at ¶¶ 27–60.

Defendants, in turn, move for summary judgment as to all Plaintiffs' claims. *See* Dkt. Nos. 65, 66.

## II.   MOTIONS FOR SUMMARY JUDGMENT

### A.   Legal Standard

Summary judgment is proper when a "movant shows that there is no genuine dispute as to

5

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

**B.   Discussion**

Defendants argue that Plaintiffs have failed to offer any evidence sufficient for a trier of fact to find them liable for Mr. Hernandez's death under any cause of action. *See* Dkt. Nos. 65 at 10–24; Dkt. No. 66 at 4–7. The Court begins with Plaintiffs' federal claims under 42 U.S.C. § 1983 for deliberate indifference, violation of the family's substantive due process right of familial association under the Fourteenth Amendment, and wrongful death.[2]

**i.   Deliberate Indifference**

A pretrial detainee's claim for deliberate indifference to medical need derives from the substantive due process clause of the Fourteenth Amendment. *See Lolli v. Cnty. of Orange*, 351 F.3d 410, 419 (9th Cir. 2003). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (quotations omitted). But "[t]he mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Gordon v. Cnty. Of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (quotation

---

[2] During the hearing on the motions, Plaintiffs conceded that they did not have sufficient evidence to support their *Monell* claim. The Court therefore **GRANTS** the motion for summary judgment as to that claim.

6

1  omitted).

2  To establish a claim for failure to provide medical treatment, a plaintiff must prove that:

3      (i)    the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
4      (ii)    those conditions put the plaintiff at substantial risk of suffering serious harm;
5      (iii)    the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
6      (iv)    by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. Such claims are "evaluated under an objective deliberate indifference standard." *Id.* at 1124–25; *see also Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) (noting that "the plaintiff must show that the defendant's actions were 'objectively unreasonable'"). This requires the plaintiff to "'prove more than negligence but less than subjective intent—something akin to reckless disregard.'" *Gordon*, 888 F.3d at 1125 (quoting *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

Here, Plaintiffs advance distinct theories of liability as to the County Defendant and the CFMG Defendants.[3] *First*, Plaintiffs argue that Deputy Han's failure to observe Mr. Hernandez every 15 minutes—as required by the IOL—led to his death because he delayed Mr. Hernandez's access to emergency medical care. *See* Dkt. No. 68 at 8, 12–13, 19, 21. *Second*, Plaintiffs argue that CFMG should have referred Mr. Hernandez to a doctor or physician assistant for an assessment of his weight loss. *See id.* at 2–4, 10; *see also* Dkt. No. 70 at 11–13, 15, 17. Had they done so, Plaintiffs suggest, Mr. Hernandez would have been diagnosed and treated, and would not have died. *Id.*

Defendants respond that Plaintiffs have failed to demonstrate a genuine dispute of material

---

[3] The Court understands that Plaintiffs believe the County is also liable for CFMG's conduct since it contracted with CFMG to provide inmates with care. *See* Dkt. No. 70 at 3–5, 11, 16. The County appears to dispute this. *See* Dkt. No. 65 at 20–21. However, the Court need not decide this issue since it finds that there is not sufficient evidence supporting Plaintiffs' theories of liability against any Defendant. Simply for clarity, the Court addresses the conduct that Plaintiffs allege against Deputy Han and CFMG separately.

fact as to the third and fourth elements of this claim—namely, that Defendants acted unreasonably in the face of Mr. Hernandez's serious medical need or that their conduct led to Mr. Hernandez's death. Critically, Defendants contend that Plaintiffs have not identified how Mr. Hernandez died, and therefore have no evidence that Defendants' actions—or inaction—caused Mr. Hernandez's death. Dkt. No. 65 at 1–2, 5–6, 10–14. To the contrary, they urge that Mr. Hernandez died suddenly and unexpectedly, such that they could not have prevented his death. *Id.*

### a. County Defendant

In the FAC, Plaintiffs initially argued that the County was responsible for Mr. Hernandez's death at a policy level due to inadequate staffing, training, and medical care. *See* FAC at ¶¶ 19, 24–27, 45–52. And as noted in footnote 2 above, Plaintiffs have conceded that they do not have evidence to support their *Monell* claim. Now in opposition and as proposed in the SAC, Plaintiffs argue instead that Deputy Han contributed directly to Mr. Hernandez's death. Plaintiffs contend that had Deputy Han followed the IOL protocol, he would have seen Mr. Hernandez when he first showed signs of medical distress; he could have sent for medical assistance faster; and he therefore could have saved Mr. Hernandez's life. *See* Dkt. No. 68 at 8, 12–13, 19, 21. But even viewing the evidence in the light most favorable to Plaintiffs, the Court finds that the record does not support this theory. Plaintiffs have not identified any evidence to support their theory that Deputy Han acted unreasonably given the information available to him at the time, or that his conduct caused Mr. Hernandez's death. *See Gordon*, 888 F.3d at 1125 (third and fourth elements of deliberate indifference claim).

There is no dispute that when Deputy Han and Deputy Ramos first checked on Mr. Hernandez on June 5 he was sitting on his bed. *See* Dkt. No. 65-1, Ex. A at 7–8. According to the deputies, Mr. Hernandez was breathing normally and was not displaying any signs of distress. *Id.* Plaintiffs do not offer any evidence to the contrary. Deputy Han then checked on Mr. Hernandez approximately an hour and fifteen minutes later (an hour later than IOL protocol dictates), at which point he was unresponsive. *Id.* at 13. Plaintiffs do not suggest that Deputy Han failed to act appropriately once he found Mr. Hernandez unresponsive. Deputy Han entered the cell, called for emergency assistance when he saw that Mr. Hernandez was not breathing, and began chest

8

compressions. *Id.*

Even assuming Mr. Hernandez died from an underlying and untreated medical condition, Plaintiffs have not identified any evidence that a reasonable official in Deputy Han's position should have known of this condition or that Mr. Hernandez's death was otherwise foreseeable. Although the deputies were required to monitor Mr. Hernandez every fifteen minutes under the IOL, this was initiated because he expressed suicidal ideation, not because of some underlying health condition.[4] *See* Dkt. No. 65-1, Ex. A at 16. Plaintiffs still suggest at several points in their opposition that "any layperson could have observed" that Mr. Hernandez "was suffering from a serious medical need." *See* Dkt. No. 70 at 12, 14. Yet they do not cite any evidence that Mr. Hernandez exhibited any visible signs of distress or other symptoms before his death. Nor is there any evidence that Mr. Hernandez requested any assistance via the emergency call button in the cell in the time between Deputy Han's observations, although it was functional. *See* Dkt. No. 65-1, Ex. A at 9.

Plaintiffs nevertheless urge that if Deputy Han had checked on Mr. Hernandez earlier—between 3:20 p.m. and 4:20 p.m.—Mr. Hernandez would have survived. Here too, Plaintiffs' evidence falls short. The Court recognizes that generally "[c]ausation is an intensely factual question that should typically be resolved by a jury." *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013). But Plaintiffs do not cite any evidence to support their conclusory assertion that Deputy Han could have prevented Mr. Hernandez's death. As the Ninth Circuit has explained, it is not the Court's role "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotation omitted). Rather, "[w]e rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.* (quotation omitted). Plaintiffs' failure to marshal such evidence is itself dispositive. But having reviewed the record in detail, the Court has not identified evidence to support Plaintiffs' claim regarding Deputy Han either.

---

[4] Plaintiffs do not appear to contend that failure to follow the IOL protocol is itself an independent basis to find that Deputy Han violated Mr. Hernandez's constitutional rights. Nor could they. *See, e.g.*, *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (noting that the failure to follow internal jail or prison policies is not itself a federal constitutional violation).

9

1    Plaintiffs' expert Dr. Alphonoso O. Swaby concludes that "[h]ad Mr. Hernandez been
2  directly observed at least every fifteen minutes as per policy, his condition would have been
3  recognized earlier and CPR started . . . ." *See* Dkt. No. 68-1, Ex. B at ¶ 1.  But Dr. Swaby does
4  not identify Mr. Hernandez's condition, let alone explain how Deputy Han—or any reasonable
5  official—would have recognized it if he had checked on Mr. Hernandez sooner.  He simply offers
6  no support for this assertion.  An expert's *ipse dixit* is not enough on its own to defeat summary
7  judgment.  *See, e.g.*, *Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 830–31 (9th Cir.
8  2001) (rejecting expert opinions on summary judgment where "there was no factual basis for the
9  [expert's] assumption"); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996)
10 ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary
11 judgment.").

12   In any event, even if the Court were to credit Dr. Swaby's conclusion that Deputy Han
13 could have started CPR sooner, Dr. Swaby only states that this "could have *potentially* saved Mr.
14 Hernandez's life." *See* Dkt. No. 68-1, Ex. B at ¶ 1 (emphasis added).  This equivocal conclusion
15 is insufficient to support Plaintiffs' theory that Deputy Han's failure to observe Mr. Hernandez
16 actually caused his death.  *See White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990) (noting that
17 conduct is an actual cause of injury "only if the injury would not have occurred 'but for' that
18 conduct").  At most, Dr. Swaby speculates that Deputy Han might have been able to save Mr.
19 Hernandez's life if he had checked on him sooner.

20   The other evidence in the record also indicates that Mr. Hernandez's death on June 5 was
21 rapid.  Plaintiffs' own expert Dr. Bennett Omalu explained that his review of tissue samples
22 indicated that Mr. Hernandez had "a type 3 myocardial injury/ necrosis, which will result in
23 *sudden* and *unexpected* death." *See* Dkt. No. 68-2, Ex. A at 8 (emphasis added).  Dr. Omalu
24 concluded that Mr. Hernandez "died as a result of *Sudden* Cardiogenic Death due to Advanced
25 Glomerulonephritis/ Chronic Interstitial Nephritis." *Id.* at 9 (emphasis added).  Drawing all
26 reasonable inferences in Plaintiffs' favor, there is simply no evidence in the record sufficient for a
27 reasonable trier of fact to conclude that Deputy Han was deliberately indifferent to Mr.
28 Hernandez's medical needs.  This is a high standard, and negligence or lack of due care are simply

1   insufficient to raise a constitutional violation. *See Gordon*, 888 F.3d at 1125 (quotation omitted).

### b. CFMG Defendants

Part of the challenge in evaluating Plaintiffs' claims against the CFMG Defendants is that their theory of liability has evolved over the course of the case. Although at a high level Plaintiffs have consistently argued that Mr. Hernandez died because Defendants did not provide him with proper medical care, they have equivocated on the specific nature of Mr. Hernandez's condition and the cause of his death. *See* Dkt. No. 68 at 10 ("[Mr. Hernandez] died because ALAMEDA and CFMG, by and through its staff, failed to provide proper medical care for Mr. Hernandez."); Dkt. No. 70 at 5, 10 ("He died because CFMG, by and through its staff, failed to provide proper care for Mr. Hernandez even though they get paid millions of dollars to provide it.").

In the FAC, Plaintiffs alleged that Defendants "failed to provide [Mr.] Hernandez with proper medical care for his viral infection" and he "died by a viral infection as a result of Defendants' collective deliberate indifference to properly evaluating, monitoring and treating him." *See* FAC at ¶¶ 19, 27. According to the FAC, Mr. Hernandez had sent a letter to his parents, which mentioned that he had been treated for some kind of infection. *See id.* at ¶ 19. However, Plaintiffs appear to have abandoned the idea that Mr. Hernandez had an untreated viral infection.

Instead, in opposition to the motions for summary judgment, Plaintiffs argue that Mr. Hernandez exhibited unintended weight loss in the weeks before his death, which should have alerted CFMG staff that Mr. Hernandez had an underlying medical condition that required treatment. *See* Dkt. No. 68 at 9–10; Dkt. No. 70 at 4–5, 9–13, 15. Plaintiffs further argue that Mr. Hernandez "would not have died since, with the exception of certain cancers (which decedent did not have), all unintended weight loss, whether caused by viruses or not, is treatable." *See* Dkt. No. 70 at 4, 9. During the hearing, Plaintiffs confirmed that Mr. Hernandez's serious medical need, for purposes of this claim, was his unintended weight loss. And when asked how Defendants' actions caused Mr. Hernandez's death, Plaintiffs stated that the cause of his weight loss was treatable.

In the proposed SAC, Plaintiffs further allege that Mr. Hernandez actually died from

11

untreated chronic kidney disease, as well as unintended weight loss. *See* SAC at ¶ 23 (arguing that Mr. Hernandez died from "sudden cardiac distress arising from his untreated unintended weight loss and chronic kidney disease.").

As an initial matter, the Court notes that its job is not to ferret out Plaintiffs' theory of the case, or construct the theory that best fits the evidence. *See, e.g.*, *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("[I]n practical effect, the court becomes the lawyer for the respondent, performing the lawyer's duty of setting forth specific facts showing that there is a genuine issue for trial. The movant is then denied a fair opportunity to address the matter in the reply papers."). Plaintiffs also cannot avoid summary judgment through obfuscation. *See Keenan*, 91 F.3d at 1279 (cautioning against briefs that "obfuscate[] rather than promote[] an understanding of the facts" on summary judgment); *see also id.* ("We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."). The Court therefore limits its review to the theory and evidence Plaintiffs appear to advance in opposition to the motions for summary judgment: Mr. Hernandez exhibited signs of unintended weight loss, and he ultimately died from the underlying cause of this weight loss and from untreated chronic kidney disease.

Defendants do not appear to dispute that Mr. Hernandez experienced significant weight loss in the weeks before he died. *See generally* Dkt. No. 66. Mr. Hernandez's medical records show that over the two months of his incarceration he lost 13 pounds. *Compare* Dkt. No. 65-1, Ex. B at 23 (weighing 150 pounds at intake on April 1), *with* Dkt. No. 73, Ex. 3 at 53–54 (weighing 137 pounds on May 29). Plaintiffs' experts opine that this amount of weight loss alone should have prompted further evaluation. Dr. Swaby, for instance, says that "based on the applicable standards of care," the amount of weight Mr. Hernandez lost in such a short period of time "should always warrant further evaluation" because "[u]nintended weight loss is often a symptom of an underlying medical disorder." *See* Dkt. No. 68-1, Ex. A at ¶¶ 1–2.

Dr. Omalu similarly states that unintended weight loss "becomes a critical medical concern that requires critical medical evaluation . . . when an individual loses more than 5% of the[ir] body weight within six to twelve months." *See* Dkt. No. 68-2 at 6. And here, Mr. Hernandez lost over

12

1    8% of his body weight over the course of just two months (137 pounds / 150 pounds = ~8.6%).
2    *Id.* at 6.

3    Based on this evidence, the Court finds that there is sufficient evidence in the record to create a triable issue of fact as to whether (1) Mr. Hernandez had a serious medical need (unintended weight loss), (2) a reasonable official in Ms. Lebon's position should have been aware of it, and (3) CFMG staff did not take reasonable available measures to further evaluate the cause of his weight loss. *See Gordon*, 888 F.3d at 1125 (third element of deliberate indifference claim).

Yet as with their claim against Deputy Han, CFMG Defendants argue that Plaintiffs have not identified sufficient evidence as to causation. "[T]o prevail on a § 1983 claim under a deliberate indifference theory, plaintiff must prove that the official's actions were both the actual and proximate cause of plaintiff's injuries." *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1242, n.3 (9th Cir. 2010), *overruled on other grounds by Castro*, 833 F.3d 1060. Even assuming CFMG staff should have conducted further evaluations of Mr. Hernandez's weight loss, Defendants contend that there is no evidence that Mr. Hernandez's death was caused by this lack of evaluation.

Although causation is ordinarily a question of fact which cannot be resolved at the summary judgment stage, the Court agrees that there is a noticeable mismatch in Plaintiffs' theory that Mr. Hernandez died from untreated weight loss and chronic kidney disease and the opinions of their medical experts—the only evidence that Plaintiffs identify. Despite Plaintiffs' suggestion otherwise, neither expert actually opines that Mr. Hernandez died from unintended weight loss and neither expert opines that Mr. Hernandez's chronic kidney disease could have been treated. In fact, the experts' initial reports appear to be in conflict.

Dr. Swaby concludes that had Mr. Hernandez's weight loss been properly evaluated, CFMG Defendants would have discovered and treated Mr. Hernandez's *pneumonia*, which Dr. Swaby says ultimately led to his death:

- According to Dr. Swaby, Ms. Lebon should have assessed Mr. Hernandez's vitals to determine if he had any other symptoms "such as fever, abnormal heart rate, low

13

1  oxygen saturation, etc." And she should have referred Mr. Hernandez to a mid-
2  level care provider, particularly in light of his entire medical record.
3  - Dr. Swaby states that Mr. Hernandez's parents thought that he had a persistent
4  cough in the weeks before his death.
5  - A proper "workup" would have included a physical exam, laboratory studies, and
6  radiological studies such as a chest X-ray (CXR).
7  - Had such a workup been done, Dr. Swaby opines, "a chest X-ray would likely have
8  discovered the pneumonia from which Mr. Hernandez was suffering."
9  - Dr. Swaby notes that "[l]ung/chest infections . . . can typically be treated efficiently
10  with prescription medication in less severe cases or with more advanced
11  intervention, up to and including intubation in more severe cases." *Id.*

13  *See* Dkt. No. 68-1, Ex. A at ¶¶ 1–4.
14      Yet Plaintiffs do not argue that Mr. Hernandez died from pneumonia or another respiratory
15  illness. And in his rebuttal report, Dr. Swaby appears to change course and opine that Mr.
16  Hernandez actually died from chronic kidney disease. *See* Dkt. No. 68-1, Ex. B at 6–7. He
17  specifically cites Dr. Omalu's report, discussed below, regarding Mr. Hernandez's cause of death.
18  But Dr. Swaby does not explain how evaluating Mr. Hernandez's unintended weight loss would
19  have detected Mr. Hernandez's chronic kidney disease. Nor does he opine that it could have been
20  treated to prevent Mr. Hernandez's death, even if identified.
21      Dr. Omalu, for his part, evaluated tissue samples, and states that the cause of death listed in
22  the autopsy "was grossly inaccurate." *See* Dkt. No. 68-2, Ex. A at 6. Based on his own
23  evaluation, he believes Mr. Hernandez had "advanced," "End-Stage" kidney disease. *See id.* at 8.
24  - Dr. Omalu states that this kidney disease "could have been caused by a myriad of
25  diseases including but not limited to metabolic and autoimmune diseases," but the
26  actual cause is unknown because it was not "adequately clinically investigated."
27  *Id.*
28  - Because of this kidney disease, he states that Mr. Hernandez "had a strong,

14

significant, and independent increased risk of suffering from cardiovascular events including death, heart failure, and myocardial infarction . . . ." *See* Dkt. No. 68-2, Ex. B at 3; *see also* Dkt. No. 68-2, Ex. A at 8–9.

- Consistent with this increased risk, Dr. Omalu concludes that Mr. Hernandez "died as a result of Sudden Cardiogenic Death" from his underlying kidney disease. *See* Dkt. No. 68-2, Ex. A at 9.

Although Dr. Omalu concludes that Mr. Hernandez's death was "preventable and avoidable," *see id.*, he does not opine that Mr. Hernandez's kidney disease was (1) related to his unintended weight loss; (2) would have been identified had Mr. Hernandez's unintended weight loss been properly evaluated; or (3) was treatable in any way. In short, Dr. Omalu does not explain how Defendants' specific conduct caused Mr. Hernandez's death as required to support a deliberate indifference claim.

Plaintiffs do not fill in these gaps. In their brief, Plaintiffs simply urge that "all unintended weight loss, whether caused by viruses or not, is treatable." *See* Dkt. No. 68 at 9. But neither of Plaintiffs' experts endorses this assertion, and Plaintiffs do not identify any other evidence in the record to support this conclusion. Dr. Omalu, for example, states only that "*most* of the causes of unintentional/ unexplained weight loss can be managed, treated, or controlled to significantly reduce the progressive decline of health, and the risk of unexpected death." *See* Dkt. No. 68-2, Ex. A at 7 (emphasis added). He also provides a non-exhaustive list of 25 different causes of weight loss, and states that "no adequate medical evaluation was performed on [Mr. Hernandez] to determine the cause of his severe and critical unintentional/ unexplained weight loss." *See id.* at 6–7; *see also* Dkt. No. 68-2, Ex. B ("He never received any medical evaluation or clinical work-up to determine what was causing his weight loss."). He does not, however, opine on the cause of Mr. Hernandez's weight loss or whether it could have been treated to prevent his death.

The Court recognizes that Plaintiffs have a difficult task in reconstructing and gathering evidence about how Mr. Hernandez died, and whether Defendants' acts or omissions caused his death. But Plaintiffs cannot sidestep this difficulty by failing to explain or proffer evidence to support their theory. Plaintiffs ultimately bear the burden of establishing that Defendants were

15

deliberately indifferent to Mr. Hernandez's serious medical need.  At this late stage in the case, they must present sufficient evidence for a reasonable jury to conclude that by failing to properly evaluate Mr. Hernandez's unintended weight loss—the serious medical need they identify for purposes of this claim—Defendants caused Mr. Hernandez's death.  *See Gordon*, 888 F.3d at 1125.  They have failed to do so and summary judgment is thus warranted.

>   **ii.   Familial Association**

Plaintiffs also argue that Defendants are liable under the Fourteenth Amendment for denial of familial association.  *See* Dkt. No. 68 at 13–14.

The Supreme Court has recognized that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984).  This freedom to enter into intimate human relationships is not protected by the First Amendment, but rather by the Fourteenth Amendment.  *See IDK, Inc. v. Cnty. of Clark*, 836 F.2d 1185, 1192 (9th Cir. 1988) ("In protecting certain kinds of highly personal relationships, the Supreme Court has most often identified the source of the protection as the due process clause of the fourteenth amendment, not the first amendment's freedom to assemble.").  The Ninth Circuit has explained that "a parent has a constitutionally protected liberty interest in the companionship and society of his or her child." *Ward v. City of San Jose*, 967 F.2d 280, 283 (9th Cir. 1991), *as amended on denial of reh'g* (June 16, 1992) (quotation omitted).  However, "[o]nly official conduct that shocks the conscience is cognizable as a due process violation."  *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (quotation omitted).  "A prison official's deliberately indifferent conduct will generally shock the conscience so as long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner."  *Id.* (quotation omitted).

Here, Plaintiffs' claim is derivative of their deliberate indifference claim.  They argue that they were deprived of their right to familial association with their son because Defendants did not provide adequate medical attention to Mr. Hernandez's serious medical need, which led to his death.  However, as already discussed in Section II.b.i above, Plaintiffs have failed to provide

1 sufficient evidence for a reasonable jury to find that Defendants were deliberately indifferent to
2 Mr. Hernandez's serious medical need.  They have likewise failed to provide sufficient evidence
3 to support this claim as well.

          **iii.**    **Wrongful Death**

5       At least as alleged in the FAC, Plaintiffs assert a wrongful death claim under § 1983, in
6 addition to under California state law.  *See* FAC at ¶¶ 29–33, 75–83.  Plaintiffs removed this claim
7 in their proposed SAC, but in their opposition to the motions for summary judgment, Plaintiffs
8 appear to pursue a wrongful death claim under § 1983.  *See* Dkt. No. 68 at 19.  Defendants argue
9 that this is improper because there is not a standalone action for wrongful death under § 1983.  *See*
10 Dkt. No. 74 at 7–8.  The Court need not address this issue because like their claim for familial
11 association, Plaintiffs' wrongful death claim is based on Defendants' alleged deliberate
12 indifference.  This claim therefore fails for the same reasons.  As discussed in Section II.B.iv
13 below, the Court does not, however, decide Plaintiffs' claim for wrongful death under California
14 state law.

15                           \*        \*        \*

16       At bottom, Plaintiffs' case turns on the idea that Defendants are responsible for Mr.
17 Hernandez's death because they did not investigate the "red flag" of unintended weight loss.
18 There is simply no evidence in the record from which a reasonable trier of fact could draw this
19 conclusion.  The Court finds that Defendants are thus entitled to summary judgment as to all
20 Plaintiffs' § 1983 claims.

21           **iv.**    **Supplemental Jurisdiction**

22       Because the Court finds that Defendants are entitled to summary judgment on Plaintiffs'
23 federal claims, all that remains are Plaintiffs' state-law claims, which are encompassed by this
24 Court's supplemental jurisdiction.  *See* 28 U.S.C. § 1367(a).  But the Court may decline to
25 exercise supplemental jurisdiction if it has dismissed all claims over which it has original
26 jurisdiction.  *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing 28
27 U.S.C. § 1367(c)(3)).  "[I]n the usual case in which all federal-law claims are eliminated before
28 trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial

economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (citation omitted) (alterations in original). The Court finds this to be "the usual case," and accordingly declines to exercise supplemental jurisdiction and dismisses Plaintiffs' state law claims without prejudice.

## III. MOTION FOR LEAVE TO AMEND

### A. Legal Standard

A party seeking to file a second or successive amendment generally "may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a). Under Federal Rule of Procedure 15(a)(2), "leave to amend shall be freely granted 'when justice so requires.'" *See Townsend v. Univ. of Alaska*, 543 F.3d 478, 485 (9th Cir. 2008) (quoting Fed. R. Civ. P. 15(a)(2)). However, "[o]nce the district court ha[s] filed a pretrial scheduling order pursuant to Federal Rule of Civil Procedure 16 which establishe[s] a timetable for amending pleadings that rule's standards control[]." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992). Rule 16 provides in relevant part that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b). The "good cause" requirement of Rule 16 "primarily considers the diligence of the party seeking the amendment." *Johnson*, 975 F.2d at 609 (quotation omitted). "Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification." *Id.*

If the Court finds that the good cause requirement of Rule 16 is met, the moving party "must then demonstrate that the motion is also proper under Rule 15." *Rodarte v. Alameda Cty.*, No. 14-cv-00468-KAW, 2015 WL 5440788, at *2 (N.D. Cal. Sept. 15, 2015). Under Rule 15, the Court may exercise its discretion to deny leave to amend due to factors such as (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) previous amendments. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Wash. State Republican Party v. Wash. State Grange*, 676 F.3d 784, 797 (9th Cir. 2012) (same).

### B. Discussion

As discussed above, Plaintiffs filed a motion for leave to amend the complaint in

1   September 2021, almost a year after the October 2020 deadline in the initial scheduling order.  *See*
2   Dkt. No. 25.  The Court therefore applies Rule 16's good cause standard, and considers Plaintiffs'
3   diligence in seeking the amendment.
4      Defendants assert that Plaintiffs are trying to change their theory of the case after the close
5   of expert discovery.  *See* Dkt. No. 63.  They further note that Plaintiffs knew Deputy Han's
6   identity and knew about Mr. Hernandez's weight loss and his kidney disease well before Plaintiffs
7   even filed the FAC back in March 2021.  *See id.* at 4–5.  They therefore suggest that Plaintiffs
8   could have amended the complaint earlier, and that their attempt to do so now is done in bad faith.
9   *See id.* at 4–5, 9.  Defendants suggest that Plaintiffs are trying to gain a tactical advantage as the
10  Court considers Defendants' motions for summary judgment.  *Id.* at 9.
11     Plaintiffs contend that they are merely seeking to "conform[] the pleadings to the evidence
12  recently obtained . . . ."  *See* Dkt. No. 62 at 2.  Plaintiffs argue that at bottom, this case turns on the
13  cause of Mr. Hernandez's death, and that this did not become clear to them until expert reports
14  were exchanged in August and September 2021.  *See id.* at 7–8.  Plaintiffs' expert Dr. Omalu, for
15  example, was not able to obtain and test tissue samples until late July 2021.  *See id.* at 5.
16  Although Plaintiffs may have been aware of Mr. Hernandez's kidney disease and weight loss
17  before then, they assert that they did not understand the significance of this information until
18  expert discovery was underway.  *See* Dkt. No. 67 at 5–6.  Moreover, they contend that they needed
19  to understand Mr. Hernandez's cause of death before they could determine if Deputy Han should
20  be added as a defendant.  *Id.*  If, for example, Mr. Hernandez "had died from a prolonged
21  infection," Deputy Han's failure to observe Mr. Hernandez in the hour before his death would
22  have been "immaterial" because Deputy Han could not have prevented Mr. Hernandez's death.
23  *Id.*
24     Defendants do no explain how Plaintiffs should have known their proposed amendments
25  were necessary without input from their experts.  Nor do Defendants appear to dispute that
26  Plaintiffs' expert was not able to analyze tissue samples from the coroner until the end of July
27  2021.  *See* Dkt. No. 62-1 at ¶ 15.  Dr. Omalu's resulting initial report was dated August 23, 2021.
28  *See* Dkt. No. 62-1, Ex. 4.  Plaintiffs sought to amend the complaint approximately a month after

Dr. Omalu finalized this report. The Court does not find a lack of diligence under these circumstances.

Nevertheless, the Court finds that amendment would be futile. During the hearing on the motions for summary judgment, Plaintiffs explained that from their perspective the factual record would be the same, regardless of the proposed amendments. Plaintiffs opposed the motions for summary judgment based on the evidence in the record and based on the theories of liability they seek to refine in the SAC. The Court considered this evidence, including Dr. Omalu's opinions about the cause of Mr. Hernandez's death, as well as Plaintiffs' arguments about why they believe Deputy Han could have prevented Mr. Hernandez's death. Plaintiffs do not suggest that further discovery is warranted or would affect the motions for summary judgment in this case. But as detailed in Section II above, the Court finds that summary judgment is still warranted in Defendants' favor as to the § 1983 claims based on this factual record. The Court therefore **DENIES** the motion for leave to amend.

## IV.   CONCLUSION

Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' § 1983 claims for deliberate indifference, familial association and wrongful death. Dkt. Nos. 65, 66. The Court also **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' *Monell* claim. *Id.* The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and therefore **DISMISSES** those claims without prejudice to refiling in state court. The Court further **DENIES** Plaintiffs' motion to amend the complaint. The Clerk is directed to enter judgment in favor of Defendants as to the § 1983 and *Monell* claims and to close the case.

**IT IS SO ORDERED.**

Dated:   1/23/2023

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge